UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:
AT LAW AND IN ADMIRALTY

STEPHEN JOHNSON and
TORI AUSTIN,

    Plaintiffs,

v.

CARNIVAL CORPORATION,
d/b/a CARNIVAL CRUISE LINES,

    Defendant.
_____

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

    The Plaintiffs, STEPHEN JOHNSON and TORI AUSTIN ("Plaintiffs"), through undersigned counsel, hereby file suit against Defendant CARNIVAL CORPORATION, a Panamanian corporation, d/b/a CARNIVAL CRUISE LINES ("CARNIVAL"), for damages and allege as follows:

    I.    JURISDICTION, PARTIES, AND VENUE

    1.    This is an action seeking damages in excess of $75,000.00, exclusive of interest, costs, and attorney's fees.

    2.    Federal subject matter jurisdiction arises under and exists by virtue of diversity of citizenship pursuant to 28 U.S.C. § 1332, as this is a civil action where the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states and/or citizens of a state and citizens or subjects of a foreign state.

    3.    Federal subject matter jurisdiction also arises under and exists by virtue of the admiralty or maritime jurisdiction pursuant to 28 U.S.C.§ 1333, and is being filed in

1

the United States District Court for the Southern District Court of Florida, Miami Division, as required by the forum and venue selection clause of the Passenger Contract Ticket issued by Defendant CARNIVAL.

4.   Venue is proper in this District, pursuant to 28 U.S.C. § 1391(b), as CARNIVAL maintains its base of operations in this District and is engaged in and doing business in Miami-Dade County, Florida, and has its principal place of business at 3655 N.W. 87th Avenue , Miami, FL 33178-2428.

5.   The Plaintiffs, STEPHEN JOHNSON and TORI AUSTIN, are residents of Georgia.

6.   Defendant, CARNIVAL CORPORATION, is authorized to do business in the State of Florida, and at all times material hereto was and is doing business in Miami-Dade County, Florida.

7.   CARNIVAL is a common carrier engaged in the business of marketing, selling and operating a cruise line at various ports within the continental United States, including, Miami, Florida, and the world, including Mexico.

8.   At all times material hereto, Defendant, personally and/or through an agent, subsidiary, and/or parent company, in the County and in the District in which this Complaint is filed:

    a.   Operated, conducted, engaged in or carried on a business venture in this state and/or county; and/or

    b.   Had an office or agency in this state and/or county; and/or

    c.   Engaged in substantial activity within this state; and/or

    d.   Committed one or more of the acts stated in Florida Statutes, Sections 48.081, 48.181 or 48.193;

9.   At all times material hereto, CARNIVAL owned, operated, managed,

maintained and/or controlled the vessel "Carnival Dream."

10.     All conditions precedent for filing and maintaining this action have been fulfilled, have been waived, or do not apply.

II.     FACTUAL   ALLEGATIONS   COMMON   TO   ALL   COUNTS (INCLUDING I, II, III, IV, V, VI, and VII)

11.     Mr. Johnson and Ms. Austin booked passage on the Carnival Dream, for a 5 Day Western Caribbean cruise departing Galveston, Texas on November 11, 2019 at 3:30 pm.

12.     Their planned itinerary had them returning to Galveston, Texas on November 16, 2019 at 8:00 am.

13.     Their booking Confirmation was BKG 9TLB15.

14.     During this cruise, Mr. Johnson unexpectedly became ill and on November 12, 2019, Mr. Johnson reported to the infirmary on board the ship where he was examined by the medical attendants.

15.     Though still feeling ill, Mr. Johnson was released by the infirmary and returned to his room.

16.     Because his condition worsened over time, Mr. Johnson and Ms. Austin returned to the infirmary on November 13, 2019.

17.     On this second occasion of Mr. Johnson presenting to the on-board infirmary, Mr. Johnson was admitted to the infirmary where he remained until November 14, 2019.

18.     After 2 days in the ship's infirmary, on November 14, 2019, after the ship

had arrived in Yucatan (Progresso), Mexico, the decision was made by the Carnival Cruise Line staff that Mr. Johnson would be transferred from the Carnival Cruise ship, and accompanied by Carnival employee Bryan Powell, to the Centro Medico Americano Hospital in Progresso. Carnival negligently allowed Mr. Johnson, accompanied by employee Powell, to be transferred from the Carnival Cruise ship to the Centro Medico Americano Hospital, by ambulance.

19.     The Carnival Dream cruise ship later departed leaving Mr. Johnson and Ms. Austin in Progresso.

20.     Approximately two days after their arrival at the Centro Medico Americano Hospital in Progresso, it was determined that that hospital in fact was not equipped or qualified to treat the medical conditions from which Mr. Johnson was suffering because Mr. Johnson required dialysis which Centro Medico Americano could not perform.

21.     Mr. Johnson was thus transported by ambulance from Centro Medico Americano Hospital to Centro Medico Pensiones Hospital, approximately 20 minutes away, on November 16, 2019 where he remained for approximately 4 hours, received dialysis, and was returned to Centro Medico Americano the same day.

22.     Upon his return to Centro Medico Americano following dialysis, Mr. Johnson's condition improved somewhat due to the dialysis, but he was still ill and he remained bedridden.

23.     At some point after dialysis, unknown to himself, on November 16, 2019, Mr. Johnson defecated on himself and his bed sheets and blanket.

24.     After Mr. Johnson was able to notice that something was amiss, Mr. Johnson and Ms. Austin advised the Centro Medico Americano personnel of this and requested that he be bathed and his bed linens, blankets, and hospital gown be changed.

25.     The Centro Medico Americano employees refused and Mr. Johnson was not bathed and his bed linens and hospital gown were not changed until the next day November 17, 2019.

26.     By November 18, 2019, Mr. Johnson's condition had improved to the point that his medical treatments ended and he could be discharged.

27.     His IV and catheter were removed and he and Ms. Austin were told and expected that he would leave Centro Medico Americano on November 19, 2019.

28.     However, Mr. Johnson and Ms. Austin were advised that they would not be discharged unless and until they paid the approximately $14,260.43 medical bill.

29.     They were also advised by the hospital administrator that the hospital would withhold a "Safe to Travel Letter" and would actually not allow the couple to physically leave the hospital until the bill was paid.

III.    <u>THE PLAINTIFFS WERE MISTREATED, FALSELY IMPRISONED, AND HELD HOSTAGE AS A RESULT OF THE NEGLIGENCE OF CARNIVAL</u>

30.     Over the next several days, Mr. Johnson and Ms. Austin were grossly mistreated and held hostage by Centro Medico Americano Hospital.

31.     Mr. Johnson and Ms. Austin were first confronted regarding the payment of the bill on November 18, 2019 by the hospital administrator, Landy Miranda, who advised them that before they could be discharged and allowed to leave the hospital, they would have to pay the $14,260.43 medical bill by 1:00 pm on November 19, 2019.

32.     Plaintiffs were unable to make arrangements to pay such a bill on short notice.

33.     The Hospital withheld the issuance of the "Safe to Travel Letter" conditioned on the same demand for payment.

34.     On November 19, 2019, Mr. Johnson was visited by a Carnival Cruise Line liaison, in Progresso, Bryan Powell, and another Carnival employee.

35.     As noted above, Mr. Powell had previously accompanied Mr. Johnson and Ms. Austin to Centro Medico Americano Hospital on November 14, 2019, and had taken Ms. Austin to the US Embassy to obtain temporary visas to be allowed to stay in Mexico, so he was well aware of the decision to take Mr. Johnson to this hospital.

36.     On the 19th Mr. Johnson and Ms. Austin were to board another Carnival Cruise ship anchoring at Progresso to return to the United States.

37.     On the 19th of November Mr. Johnson and Ms. Austin explained to Mr. Powell what they had been told about their situation and that the hospital had demanded payment to allow them to leave and was withholding the Safe to Travel Letter and was physically holding them hostage.

38.     Mr. Powell stated that without the letter from the hospital, there was nothing that he could do and Powell and the other Carnival employee left Johnson and Austin in the hospital and departed.

39.     That same day Ms. Austin then called the US Embassy and spoke to an employee who advised them that if they were not being medically treated, the Centro Medico Americano Hospital could not hold them against their will.

40.     At that time Mr. Johnson was in fact not being medically treated as they had

already advised Carnival and Powell.

41.     Upon learning that Mr. Johnson and Ms. Austin were being mistreated and held against their wills, Carnival Cruise Lines, and its employees, and agents failed to exercise due care to secure their release from Centro Medico Americano Hospital.

IV.     THE PLAINTIFFS ATTEMPT TO LEAVE CENTRO MEDICO AMERICANO HOSPITAL

42.     Based on the information from the U. S. Embassy, Mr. Johnson and Ms. Austin attempted to leave/escape from the hospital.

43.     Ms. Austin left the hospital to obtain a duffel bag in which to place their belongings and to obtain cash for a taxi in hopes of getting to an airport in order to leave the country.

44.     Mr. Johnson remained in the hospital and dressed himself in his own clothing.

45.     When Ms. Austin returned they both left through an emergency door.

46.     Ms. Austin had noticed that a festival was taking place around the hospital and hoped that they could escape by getting lost in the crowd.

47.     She carried all of their bags and supported Mr. Johnson as they walked out of the hospital down a ramp outside the emergency exit door.

48.     Outside the emergency door, they were met at the bottom of the ramp by the hospital administrator, Landy Miranda, and an ambulance driver known to Mr. Johnson and Ms. Austin as Felix.

49.     Miranda demanded to know where they were going, to which they replied that they were going home.

50.     Ms. Miranda objected and stated that they would not be allowed to leave.

51.     An altercation ensued in which Landy Miranda took the top off of a trash can and began to use the trash can top as a sort of shield with which to repeatedly push Mr. Johnson back up the ramp into the hospital, with the help of Felix.

52.     Felix also began pushing Ms. Austin who was carrying their belongings and attempting to support Mr. Johnson.

53.     In this violent confrontation, Ms. Miranda actually struck Mr. Johnson in the dialysis port that remained in his left neck with her hand.

54.     He began to bleed from the port.

55.     She also struck him on his right shoulder/neck area where the IV shunts had been placed.

56.     Mr. Johnson and Ms. Austin yelled for the police and screamed out for help.

57.     Mr. Johnson grabbed a trash can and pushed it down between himself and Miranda and Felix in an attempt to escape.

58.     Miranda and Felix continually pushed, shoved, and hit Johnson and Austin as they moved them backwards up the ramp and never relented in their efforts to force them back into the hospital.

59.     During this altercation, the police eventually arrived and the officers spoke to Landy Miranda.

60.     Mr. Johnson and Ms. Austin do not know what was said, but the police left without intervening.

61.     Once the police departed, Felix pushed and shoved Mr. Johnson all the way back to his room inside the hospital while Mr. Johnson was pleading with them to be allowed to "go home."

62.     Back in their room, the Plaintiffs locked their door to keep everyone out.

63.     Later that evening more Mexican police arrived and asked to enter their room.

64.     When the Plaintiffs opened the door, there were 3 police officers present.

65.     They came in and in a short interview the one officer who spoke English asked if they had insurance to which Mr. Johnson replied that he did have insurance.

66.     He told the officers that the hospital was holding them against their wills.

67.     Upon learning that Mr. Johnson had insurance the officers left the hospital.

68.     The next day, November 20, 2019, Ms. Austin walked 3 miles to the police station to file a charge of assault and holding them against their will against the hospital, Landy Miranda, and Felix.

69.     Landy Miranda was contacted about the charge and it was reported to Mr. Johnson and Ms. Austin that Ms. Miranda stated that Mr. Johnson had undergone surgery, that he had become infected, and that it was not safe for him to leave the hospital.

70.     This was untrue as Mr. Johnson had not undergone surgery, had no infection, and was in fact previously cleared to leave on November 18, 2019.

71.     The Mexican police took no further action.

72.     Following her report to the police, Ms. Austin walked three miles back to the hospital.

73.     Back at the hospital, while Ms. Austin was away, the nurses and staff of the hospital would enter Mr. Johnson's room and go through their belongings, thus, from that point forward, each time she left, Ms. Austin would pack up all of their belongings and take them with her, except for Mr. Johnson's cell phone.

V.      CARNIVAL EMPLOYEES' CONTACTS WITH THE PLAINTIFFS

74.     After the second Carnival ship left on November 19, 2019, on November 21, 2019, and again on November 22, 2019  persons identifying themselves as Carnival representatives called on Ms. Austin's cell phone to inquire about their condition and circumstances.

75.     Mr. Johnson and Ms. Austin continued to tell the Carnival representatives what had occurred, and that they were still being held in Progresso.

76.     After these calls, no one from Carnival Cruise Lines directly contacted Mr. Johnson or Ms. Austin until their story became national news, while Mr. Johnson was hospitalized back in the United States in late November of 2019.

77.     However, on November 21, 2019, while Mr. Johnson and Ms. Austin were still in Centro Medico Americano Hospital, Mr. Johnson's sister, received a call on her cell phone from a male family member, who was employed by Carnival Cruise Lines.

78.     She first received a voice mail from the family member, asking her to call him directly.

79.     Mr. Johnson's sister called the family member (and Carnival employee) back at 7:17 pm EST with the call lasting for 6 minutes and 26 seconds.

80.     Initially, the family member who was the Carnival employee was the only person speaking to Mr. Johnson's sister.

81.     In this initial discussion, he advised her that his job was being threatened and that there were executives from Carnival Cruise Lines who wished to speak to her about the Johnson/Austin matter.

82.     He then apparently went into a conference room and Mr. Johnson's sister

could tell that he placed his phone on speaker phone.

83.     There were two male Carnival Cruise Lines executives present and they introduced themselves as such.

84.     They advised Mr. Johnson's sister that they were aware that Ms. Austin was scheduled to do an interview with "Good Morning America" the following morning, November 22, 2019.

85.     They advised her that Carnival did not like the publicity that was being generated by Ms. Austin posting from their hospital room regarding their captivity in Mexico and did not like the negative spotlight being shone on Carnival by the news interviews Ms. Austin was giving to the media.

86.     The Carnival executives ordered Mr. Johnson's sister to instruct Ms. Austin to paint a positive picture of Carnival Cruise Lines in the upcoming interview on "Good Morning America."

87.     The Carnival Cruise executives dictated what they wished Ms. Austin to say in her appearance on "Good Morning America" the following day.

88.     Mr. Johnson's sister typed out the wording that was being given to her by the Carnival employees in a text to Ms. Austin, as it was being dictated to her by the Carnival executives.

89.     The text sent to Ms. Austin by Mr. Johnson's sister, including the statement that Carnival insisted that Ms. Austin make to "Good Morning America", was as follows:

"*RB job being jeopardized **we have to make a statement w the news** that dream carnival provided excellent care and due to his condition he had to go to the nearest hospital. The ship was not aware of this hospitals reputation for mistreatment of Americans. The dream carnival went over and beyond to stabilize Stephen and attempted to assist with the hospital releasing him. The hospital is breaking the law and must be exposed. I have requested tori to include this with good morning America and other news stations.*"

90.     At the end of the conversation, one of the Carnival executives instructed Mr. Johnson's sister that after making the dictated statement, it was Carnival's expectation that Mr. Johnson and Ms. Austin should "not mention Carnival Cruise Lines again" in connection with their story.

91.     In her video appearance on "Good Morning America" the following day, Ms. Austin did not make the above statement, as it was untrue.

92.     Ms. Austin's statement was shortened to say that Carnival had attempted to stabilized Mr. Johnson while he was onboard the Carnival Dream.

VI.     CARNIVAL KNEW OR SHOULD HAVE KNOWN THAT CENTRO MEDICO AMERICANO HOSPITAL WAS UNSAFE FOR AMERICANS AND PLAINTIFFS

93.     The above dictated statement by Carnival Cruise Lines, that it had no knowledge of the reputation of Centro Medico Americano Hospital to mistreat Americans in this manner, was known to be false when Mr. Johnson was taken to that hospital on November 14, 2019, and it was known to be false when it was told to Mr. Johnson's sister by the Carnival executives on November 21, 2019.

94.     Carnival's statement is directly contradicted by the U. S. Embassy, Department of State, which has confirmed that Centro Medico Americano Hospital was off-limits for Americans and is publicly published as such by the U.S. Embassy.

95.     The U.S. Embassy has stated: ". . . *Centro Medico Americano Hospital is not on the list*, (of approved hospitals for Americans in Mexico) *due to previous problems experienced by other U.S. Citizens.*"

96.     Thus Carnival Cruise Lines knew or should have known that Centro Medico Americano Hospital was off limits for the transport of Mr. Johnson, an American citizen,

for medical care.

97.     As well, Carnival Cruise Lines had <u>actual knowledge</u> of the "no-go" status of Centro Medico Americano Hospital.

98.     Yet, its employees failed to take the appropriate steps for the safety of Plaintiffs, which should have been to transport Mr. Johnson to Centro Medico Pensiones Hospital, which was only 20 minutes away, or to any other approved hospital, or to warn the Plaintiffs of the dangers presented by the Centro Medico Americano Hospital.

VII.    <u>THE CONTINUING MISTREATMENT OF PLAINTIFFS</u>

99.     Once Mr. Johnson was forced to return to his hospital room on November 19, 2019, he was needlessly reconnected to an IV and unknown drugs were administered to him.

100.    The floor of Plaintiffs' hospital room was covered in water with blood drops on the floor.

101.    The water was from the toilet in their room that overflowed whenever it was flushed.

102.    The hospital would only mop the floor occasionally, but the toilet constantly overflowed.

103.    The blood on the floor came from the urinary catheter that Mr. Johnson had to wear while hospitalized at Centro Medico Americano Hospital.

104.    He was in excruciating pain the entire time that the catheter was in place.

105.    His urethra and penis eventually began to have a burning sensation and he began to bleed from the catheter.

106.    Plaintiffs' asked the hospital personnel to check the catheter but that was not done until the catheter was finally removed.

107.    While it was in place, Mr. Johnson's penis became red swollen and painful and he dripped blood until it was removed.

108.    Ms. Austin applied cream to it as best she could with little effect.

109.    Because of the drugs being administered to him after their attempted escape, Mr. Johnson's condition deteriorated. While he had been cleared to leave on November 18, 2019 and able to attempt to walk out of the hospital under his own power on November 19, 2019, the subsequent treatment at the hospital led him to be lethargic and semiconscious.

110.    He was able only to mostly sleep and while awake was groggy and semi-coherent.

111.    When Ms. Austin inquired as to what was being administered she was told an antibiotic and an ""antidote." She was never told what the actual medications were, or what condition(s) they were supposedly treating.

112.    From November 19, 2019 to November 26, 2019, Mr. Johnson's medical condition grew markedly worse.

113.    Upon arriving back in Atlanta on November 26, 2019, Johnson was taken directly to Northside Hospital for treatment where he remained until December 2, 2019.

VIII.   THE PAYMENT OF THE HOSPITAL BILL

114.   On November 20, 2019, a personal friend of Ms. Austin began a "go-fund-me" page to help raise the money to pay the bills being demanded by the Centro Medico Americano Hospital.

115.   At the same time, Ms. Austin began to post their story on Facebook from their hospital room.

116.   The "go-fund-me page" and the Facebook posts generated public interest in the story and several local and national news organizations began to call Ms. Austin to request interviews.

117.   Eventually, movie producer Tyler Perry became aware of the plight of Mr. Johnson and Ms. Austin.

118.   On November 23, 2019. Mr. Perry called Mr. Johnson and Ms. Austin and advised them that he would assist them in paying the hospital bill and leaving Mexico.

119.   The Centro Medico Americano Hospital was advised that Mr. Perry would in fact make the transfer and he assured them that payment would be made.

120.   The hospital demanded that a wire transfer be accomplished to make the payment.

121.   The hospital provided Mr. Johnson and Mr. Perry with wiring instructions to make the transfer.

122.   However, this could not be done immediately as it was a weekend.

123.   After the wire by Tyler Perry was confirmed by the hospital, Mr. Johnson was finally released from Centro Medico Americano Hospital on November 25, 2019.

124.    Plaintiffs were met by employees of the US Embassy, having heard nothing from Carnival for several days. The Plaintiffs spent the night in a hotel.

125.    Mr. Perry arranged a Delta Air Lines flight out of Mexico for Mr. Johnson and Ms. Austin on November 26, 2019.

126.    As stated above, Mr. Johnson was taken directly from the airport to Northside Hospital in Atlanta, Georgia, where he remained until December 2, 2019.

COUNT I: NEGLIGENCE OF CARNIVAL

127.    Plaintiffs re-allege and adopt paragraphs 1-126, as though fully set forth herein.

128.    At all times material hereto, it was the duty of Defendant Carnival to exercise reasonable care under the circumstances regarding the Plaintiffs.

129.    Carnival failed in that duty.

130.    46 U.S.C. App. § 30506. Limit of liability for personal injury or death, in pertinent part states:

**(e) Privity or knowledge.**    In a claim for personal injury or death, the privity or *knowledge of the master or the owner's superintendent* or managing agent, at or before the beginning of each voyage, *is imputed to the owner.*

131.    It was known to Carnival Cruise Lines that American guests of the cruise line were specifically not to be taken to Centro Medico Americano Hospital, in Yucatan (Progresso) Mexico.

132.    Directing and allowing Mr. Johnson to be transported from the Carnival Dream infirmary to Centro Medico Americano Hospital was a deviation from the standard practices within the industry and violated the legal and statutory duties owed to its passengers and Plaintiffs under the law.

133.    Centro Medico Americano Hospital was well known by the US Embassy Mexico, Carnival Cruise Lines, and within the cruise and travel industry to engage in the precise extortionate and substandard medical practices as were done to Mr. Johnson and Ms. Austin.

134.    Even more, the US Embassy publicly published and provided a list of approved hospitals in various regions of Mexico to which Americans may be taken and made the Cruise and Travel industry aware of hospitals that are "no-go" hospitals for Americans in Mexico.

135.    This listing for each region of Mexico is available on the U.S. Embassy website.

136.    Carnival Cruise Lines, as a common carrier and international cruise line operator transporting United States Citizens has a specific duty to be aware of and protect its passengers from dangers such as those posed by Centro Medico Americano Hospital.

137.    Further, Carnival Cruise Lines knew or should have known of this listing, and was required to act appropriately under the circumstances.

138.    Carnival Cruise Lines ignored the fact that on November 14, 2019, when it arranged to transport Mr. Johnson from its infirmary to Centro Medico Americano Hospital, Centro Medico Pensiones Hospital, a hospital that was specifically on the approved list of hospitals for Americans in Mexico, was only 20 minutes away.

139.    The information that Centro Medico Americano Hospital was not approved for the transport and care of Americans and the fact that Centro Medico Pensiones Hospital was approved for the transport and care of Americans in Mexico was known to Carnival Cruise Lines at the time its employees transported (and accompanied) Mr.

Johnson to Centro Medico Americano Hospital. Carnival never advised the Plaintiffs of this fact or warned them of the dangers presented when it took them to this hospital.

140.    This negligence on the part of Carnival Cruise Lines and its employees directly caused the harm suffered by Mr. Johnson and Ms. Austin, led to the substandard and unnecessary medical care to Mr. Johnson, and endangered his life and liberty.

141.    The dangerous situation to which Carnival Cruise Lines negligence subjected the Plaintiffs is further demonstrated by the fact that upon arrival at Centro Medico Americano Hospital, it was determined that that hospital could not adequately treat his condition and he was then, in turn, transported to Centro Medico Pensiones Hospital for dialysis.

142.    In short, Mr. Johnson should not have been transported or allowed to be taken off the Carnival Cruise Lines ship infirmary to Centro Medico Americano Hospital.

143.    **Wherefore,** Plaintiffs demand judgment against Defendant for compensatory damages, including pre-judgment interest, and costs, and further because Defendant's actions were intentional, deliberate, and/or so wanton and reckless as to demonstrate a conscious disregard of the rights of Plaintiffs, Plaintiffs pray for the imposition of punitive damages against Carnival, and all damages allowable by law and further demands trial by jury of all issues so triable as a matter of right, as well as any further relief as this Court deems just and appropriate.

COUNT II: ACTUAL AGENCY AND RESPONDEAT SUPERIOR

144.    Plaintiffs re-allege and adopt paragraphs 1 - 143, as though fully set forth.

145.    At all times material, Defendant's employees, agents, doctors, nurses, officers, crew, administrative staff and executives were employed by the Defendant, as its

agents and employees and were at all times material acting within the scope and course of their employment.

146.    At all times material, Defendant's employees, agents, doctors, nurses, officers, crew, and shipboard and non-shipboard administrative staff and executives were employed by the Defendant, and were at all times material acting within the scope and course of their employment.

147.    The Defendant promotes its agents, doctors, nurses, officers, crew, and shipboard and non-shipboard administrative staff and executives and other employees and represents them as being their employees through brochures, internet advertising, and on the vessel.

148.    The Defendant held out its staff, including employees, agents, doctors, nurses, officers, crew, and shipboard and non-shipboard administrative staff and executives as being direct employees or its actual agents.

149.    At all times material, the Defendant held out its employees, agents, doctors, nurses, officers, crew, and shipboard and non-shipboard administrative staff and executives as being its employees, including those who work on board the ship and in the Defendant's "medical centers" on the vessel.

150.    The Defendant promoted its employees, agents, doctors, nurses, officers, crew, and shipboard and non-shipboard administrative staff and executives and medical

staff and represented them as being their employees through brochures, internet advertising, and on the vessel.

151.    Defendant held out its employees, agents, doctors, nurses, officers, crew, and shipboard and non-shipboard administrative staff and executives and medical staff, including its doctors and nurses, as being direct employees or its actual agents.

152.    Defendant promoted the idea that its employees, agents, doctors, nurses, officers, crew, and shipboard and non-shipboard administrative staff and executives, and other medical staff who work on board the ship and in its "medical centers" are employed by the cruise line as part of a marketing tool to induce passengers such as the Plaintiffs to buy cruises on its ships, particularly because the cruise line goes to various foreign ports which may not have adequate medical care.

153.    Defendant manifested to the Plaintiffs in this case that its employees, agents, doctors, nurses, officers, crew, and shipboard and non-shipboard administrative staff and executives and other medical staff, were acting as its employees and/or actual agents in various ways.

154.    The "medical centers" are owned and operated by Defendant which pays to stock the "medical centers" with all supplies, various medicines and equipment.

155.    At the time of Plaintiffs' injuries, Mr. Johnson was assessed, examined and treated by the ship's nurses and/or physicians.

156.    Based on the foregoing, the Plaintiffs believed, and were reasonable in their beliefs, that the ship's employees, agents, doctors, nurses, officers, crew, and shipboard and non-shipboard administrative staff and executives and medical staff were acting as direct employees or actual agents on behalf of the Defendants, and were never given any reason to believe otherwise.

157.    Plaintiffs relied to their detriment on their belief that the employees, agents, doctors, nurses, officers, crew, and shipboard and non-shipboard administrative staff and executives and medical staff were direct employees or actual agents of the Defendant in that the Plaintiffs followed the advice of the doctors and/or nurses and other agents of the Defendant.

158.    Defendant is liable to the Plaintiffs for any and all damages as a result of any negligence of its employees, agents, doctors, nurses, officers, crew, and shipboard and non-shipboard administrative staff and executives and medical staff, and for any negligent medical care by the physicians and/or nurses under the theories of actual agency and *respondeat superior.*

159.    The conduct of Defendants, as described above, directly and proximately caused the injuries and damages to Plaintiffs.

160.    **Wherefore,** Plaintiffs demand judgment against Defendant for compensatory damages, including pre-judgment interest, and costs, and further because

Defendant's actions were intentional, deliberate, and/or so wanton and reckless as to demonstrate a conscious disregard of the rights of Plaintiffs, Plaintiffs pray for the imposition of punitive damages against Carnival, and all damages allowable by law and further demands trial by jury of all issues so triable as a matter of right, as well as any further relief as this Court deems just and appropriate.

<u>COUNT III: APPARENT AGENCY</u>

161.    Plaintiffs adopt and re-allege each and every allegation contained in paragraphs 1-160, as though fully set forth herein.

162.    At all times material, Defendant held out its medical staff, including its doctors and nurses, as being its employees who work in the Defendant's "medical centers" on the vessel and promoted its medical staff and represented them as being their employees through brochures, internet advertising, and on the vessel.

163.    The Defendant promoted the idea that the medical staff who work in its "medical centers" are employed by the cruise line as a part of a marketing tool to induce passengers such as the Plaintiffs to buy cruises on its ships, particularly because the cruise line goes to various foreign ports which may not have adequate medical care.

164.    The Defendant manifested to the Plaintiffs in this case that its medical staff were acting as its employees and/or apparent agents in various ways.

165.    The medical staff in this case, including doctors and nurses, were given uniforms to wear which included name tags, and which have the CARNIVAL name and logo.

166.    Said uniforms were required by Defendant to be worn by doctors and

nurses.

167.    The doctors are considered to be an Officer on board the vessel and a member of the crew, and were introduced to the passengers as one of the ship's Officers.

168.    Both doctors and nurses were held out to the passengers by Defendant as being members of the ship's crew.

169.    The Defendant put the ship's doctors and nurses under the command of the ship's superior officers, including the Master of the ship.

170.    The cruise line represents to immigration authorities that the doctors and nurses are members of the ship's crew.

171.    Both the ship's doctors and nurses are permitted to eat with the ship's crew.

172.    The ship's doctors and nurses provided services in the ship's "medical centers" and the Plaintiff was required to go to the ship's medical center to be seen for his condition.

173.    At the time of Plaintiff's treatment, Plaintiff Johnson was seen and examined by the ship's nurses and/or physicians.

174.    Based on the foregoing, the Plaintiffs believed, and were reasonable in their belief that the ship's nurses and doctors were acting as direct employees or actual agents on behalf of the Defendant, and were never given any reason to believe otherwise.

175.    The Plaintiffs relied to their detriment on their belief that the doctors and nurses were employees or actual agents of the Defendant in that the Plaintiffs followed the advice of the nurses and/or doctors.

176.    Defendant is liable to the Plaintiff for any and all damages as a result of

negligent medical care by the physicians and/or nurses under the theory of apparent agency.

177. **Wherefore,** Plaintiffs demand judgment against Defendant for compensatory damages, including pre-judgment interest, and costs, and further because Defendant's actions were intentional, deliberate, and/or so wanton and reckless as to demonstrate a conscious disregard of the rights of Plaintiffs, Plaintiffs pray for the imposition of punitive damages against Carnival, and all damages allowable by law and further demands trial by jury of all issues so triable as a matter of right, as well as any further relief as this Court deems just and appropriate.

<u>COUNT IV: FALSE IMPRISONMENT</u>

178. Plaintiffs re-allege and adopt paragraphs 1-177 as if fully restated herein

179. Defendant Carnival intentionally restrained, or caused the intentional retention of Plaintiff's, under circumstances that were unreasonable and unwarranted and without legal authority, which caused them harm.

180. Plaintiffs were held against their wills and did not consent to the restraint, were not free, and did not reasonably believe they were free, to leave the place to which they had been confined.

181. This false imprisonment was without legal authority, intentional, and was a legal cause of the injury or damage that Plaintiffs sustained.

182. Defendant Carnival's actions led to the restraint of Plaintiffs, with the purpose of causing the restraint, or, acted with knowledge that Plaintiffs' restraint would, to a substantial certainty, result from Defendant's acts.

183.    Defendant Carnival's conduct caused the intentional restraint of Plaintiffs by operating in combination with the acts of other persons, and other causes that occurred at the same time and played a part in causing the injury or damage to Plaintiffs.

184.    **Wherefore,** Plaintiffs demand judgment against Defendant for compensatory damages, including pre-judgment interest, and costs, and further because Defendant's actions were intentional, deliberate, and/or so wanton and reckless as to demonstrate a conscious disregard of the rights of Plaintiffs, Plaintiffs pray for the imposition of punitive damages against Carnival, and all damages allowable by law and further demands trial by jury of all issues so triable as a matter of right, as well as any further relief as this Court deems just and appropriate.

<u>COUNT V: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>

185.    Defendant Carnival intentionally or recklessly engaged in extreme and outrageous conduct.

186.    Defendant Carnival's conduct was a legal cause of severe emotional distress to Plaintiffs.

187.    Defendant Carnival engaged in conduct or behavior, which, under the circumstances, went beyond all possible bounds of decency and is regarded as shocking, atrocious, and utterly intolerable in a civilized community.

188.    Defendant Carnival's conduct was extreme and outrageous, and actually caused severe emotional distress to Plaintiffs.

189.    Defendant Carnival's conduct contributed to the severe emotional distress that Plaintiffs suffered, and its acts or omissions legally caused Plaintiffs severe emotional

distress.

190.     Defendant Carnival's conduct operated in combination with the acts of other persons and other causes that occurred at the same time as its extreme and outrageous conduct and that conduct played a part in causing the severe emotional distress to Plaintiffs.

<u>COUNT VI: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS</u>

191.     Based upon all of the above stated facts, Defendant Carnival negligently engaged in extreme and outrageous conduct which caused extreme emotional distress in the Plaintiffs, which has resulted in physical manifestations to both Plaintiffs.

192.     Defendant Carnival's conduct operated in combination with the acts of other persons and other causes that occurred at the same time as its extreme and outrageous conduct and that conduct played a part in causing the severe distress to Plaintiffs.

193.     As a result of the conduct of Defendant, and the emotional distress suffered therefrom, Plaintiffs have suffered physical injuries which make Carnival liable to the Plaintiffs for negligent infliction of emotional distress.

194.     **Wherefore,** Plaintiffs demand judgment against Defendant for compensatory damages, including pre-judgment interest, and costs, and further because Defendant's actions were intentional, deliberate, and/or so wanton and reckless as to demonstrate a conscious disregard of the rights of Plaintiffs, Plaintiffs pray for the imposition of punitive damages against Carnival, and all damages allowable by law and further demands trial by jury of all issues so triable as a matter of right, as well as any

further relief as this Court deems just and appropriate.

### COUNT VII: NEGLIGENT MISREPRESENTATION

195.   As outlined above, at all times pertinent hereto, Defendant Carnival made (1) misrepresentations of material fact which were in fact false; (2) Defendant Carnival was negligent in making the statements because it should have known the representations were false; (3) Defendant Carnival intended to induce the plaintiffs to rely on the representations; and (4) injury resulted to the plaintiffs acting in justifiable reliance upon the misrepresentations. Plaintiffs relied on Carnival's actions in taking them to the Medico Centro Americano Hospital, believing it to be a safe place for U.S. citizens to be provided medical care and treatment, and that reliance resulted in injuries and damages to the Plaintiffs.

196.   **Wherefore,** Plaintiffs demand judgment against Defendant on their count for negligent misrepresentation, for compensatory damages, including pre-judgment interest, and costs, and further because Defendant's actions were intentional, deliberate, and/or so wanton and reckless as to demonstrate a conscious disregard of the rights of Plaintiffs, Plaintiffs pray for the imposition of punitive damages against Carnival, and all damages allowable by law and further demands trial by jury of all issues so triable as a matter of right, as well as any further relief as this Court deems just and appropriate.

**WHEREFORE,** Plaintiffs demand judgment against Defendant for compensatory damages in excess of $75,000.00 Dollars including pre-judgment interest, and costs, and further because Defendant's actions were intentional, deliberate, and/or so wanton and reckless as to demonstrate a conscious disregard of the rights of Plaintiffs, Plaintiffs pray for the imposition of punitive damages against Carnival, and all damages allowable by law, and, further demand a trial by jury of all issues so triable as a matter of right, as well as any further relief as this Court deems just and appropriate.

Respectfully submitted this 10th day of November, 2020.

*/s/ Eugene K. Pettis*
EUGENE K. PETTIS
Florida Bar Number:
Haliczer Pettis & Schwamm, PA
One Financial Plaza
100 SE Third Avenue, 7th Floor
Fort Lauderdale, FL 33394
Phone: 954-523-9922
service@hpslegal.com

*/s/ Marvin A. Devlin*
MARVIN A. DEVLIN
Georgia Bar No. 219969
Juanita F. Devlin
Georgia Bar No. 426055

**Marvin A. Devlin P.C.**
Attorney at Law
6595-G Roswell Road
Suite 765
Atlanta, Georgia 30238
Tel: 404-538-6925
Fax: 404-537-3115
E-Mail: mad@marvindevlin.com

[Anticipated admission pro hac vice]