UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-cv-24620-MCALILEY
(CONSENT CASE)

STEPHEN JOHNSON and
TORI AUSTIN,

      Plaintiffs,

v.

CARNIVAL CORPORATION d/b/a
CARNIVAL CRUISE LINES,

      Defendant.

_____/

### ORDER GRANTING DEFENDANT'S MOTION
### TO DISMISS AMENDED COMPLAINT

Defendant, Carnival Corporation d/b/a Carnival Cruise Lines ("Carnival"), filed a motion to dismiss Plaintiffs' Amended Complaint with prejudice (the "Motion"). (ECF No. 41). Plaintiffs, Stephen Johnson and Tori Austin, filed a response memorandum, and Carnival filed a reply. (ECF Nos. 42, 43). For the reasons that follow, the Court grants the Motion and dismisses Counts II, IV and V with prejudice and Counts I, III and VI without prejudice.

### I.    Procedural history

Plaintiffs filed their first Complaint against Carnival in November 2020. (ECF No. 1). Carnival moved to dismiss six of the seven counts for failure to state a claim under Federal Rule of Civil Procedure Rule 12(b)(6), and on the grounds that each claim was a shotgun pleading. (ECF No. 12). The six counts Carnival challenged were: (1) actual

1

agency and respondeat superior, (2) apparent agency, (3) false imprisonment, (4) intentional infliction of emotional distress ("IIED"), (5) negligent infliction of emotional distress ("NIED") and (6) negligent misrepresentation. (*Id.*). Carnival did not move to dismiss Plaintiffs' negligence claim.

In July 2021, the Court heard oral argument on that motion. *See* (ECF No. 35). At that time, the Court addressed a number of deficiencies, to include that it was an improper shotgun pleading. The Court dismissed without prejudice all but the negligence count. (ECF No. 36).

In August 2021, Plaintiffs filed the Amended Complaint, which makes few changes to the factual allegations. Plaintiffs do, however, replead some, but not all, of the claims that were in the initial Complaint, and this includes dividing the negligence claim into two counts. (ECF No. 38). The six counts are: (1) IIED as to Stephen Johnson, (2) IIED as to Stephen Johnson and Tori Austin, (3) negligence as to Stephen Johnson, (4) negligence as to Stephen Johnson and Tori Austin, (5) false imprisonment as to Stephen Johnson and Tori Austin and (6) NIED as to Tori Austin. (*Id.*).

Carnival asks the Court to dismiss all counts with prejudice for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and, alternatively, to strike each claim's prayer for punitive damages. (ECF No. 41).

## II.    Background

The Court sets forth here Plaintiffs' allegations that are pertinent to Carnival's Motion. The Court assumes, as it must at this stage of the proceedings, that Plaintiffs' factual allegations are true, and it casts those facts in the light most favorable to Plaintiffs.

*Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 994-95 (11th Cir. 1983) (citations omitted).

Plaintiffs Stephen Johnson and Tori Austin booked a five-day Western Caribbean cruise together, which departed from Galveston, Texas on November 11, 2019, and was scheduled to return there on November 16th. (ECF No. 38 ¶¶ 11-13).

On November 12th, while on board the cruise, Mr. Johnson became ill. (*Id.* ¶ 14). He sought treatment and was eventually admitted to the ship's infirmary. (*Id.* ¶¶ 14-17).

On November 14th, the ship arrived in Progreso, in Yucatan, Mexico. (*Id.* ¶ 18). Mr. Johnson was transferred by ambulance from the ship to the Centro Medico Americano Hospital (the "CMA Hospital" or "Hospital") in Progreso. (*Id.*). Ms. Austin and Brian Powell, a "port agent, who was an agent, servant or employee of Carnival", accompanied Mr. Johnson to the Hospital. (*Id.* ¶¶ 19-20). Mr. Powell left Plaintiffs at the Hospital and the cruise ship departed Progreso. (*Id.* ¶ 20).

The conditions in the Hospital were "unsanitary and dangerous, with, for example, blood drops and feces never properly cleaned from the floors and bed linens, overflowing toilets and filthy rooms, bathrooms and hallways." (*Id.* ¶ 58). The Hospital could not provide the dialysis treatment that Mr. Johnson needed, so on November 16th, the Hospital transported him to a different hospital, approximately twenty minutes away. (*Id.* ¶ 22). After he received treatment there, Mr. Johnson was returned to the CMA Hospital the same day. (*Id.*).

Mr. Johnson and Ms. Austin stayed at the CMA Hospital until Mr. Johnson's condition improved. (*Id.* ¶¶ 23-24). On November 18th, his treatments ended, and the

Hospital determined he could be discharged. (*Id.* ¶ 24). The Hospital advised Plaintiffs that Mr. Johnson could leave the next day, but that he would not be discharged or allowed to leave without full payment of the $14,260.43 medical bill. (*Id.* ¶¶ 24-25, 27).

On November 19th – the day Plaintiffs were scheduled to board another Carnival ship to return to the United States – Bryan Powell and another "agent, servant or employee of Carnival" came to the Hospital to accompany them back to the ship. (*Id.* ¶¶ 29-30). Plaintiffs told them of the Hospital's demands and that they could not make payment on such short notice. *See* (*id.* ¶¶ 28, 31). Mr. Powell and the other individual stated that there was nothing they could do and left Plaintiffs there. (*Id.* ¶ 32). Ms. Austin then spoke to a U.S. Embassy representative, who told her that the Hospital cannot hold them there if they are not receiving any medical treatment. (*Id.* ¶ 34).

Later that day, Plaintiffs tried to leave the Hospital on their own but were unsuccessful. (*Id.* ¶¶ 37-41). Ms. Austin first left to pack some belongings for them while Mr. Johnson stayed, as the Hospital would not let him go. (*Id.* ¶ 38). When she returned, they walked out of the Hospital together through an emergency door. (*Id.* ¶ 39). While they walked down a ramp outside the door, two Hospital employees – known as Miranda and Felix – confronted them and told them they could not leave. (*Id.* ¶ 40). An altercation ensued and Miranda took the top off a trash can and began to use it as a shield. (*Id.* ¶ 41). Both Miranda and Felix repeatedly pushed Plaintiffs back up the ramp into the Hospital and hit them. (*Id.* ¶¶ 41, 44). During the altercation, Miranda struck Mr. Johnson in the dialysis port in his neck, which caused him to bleed, and struck his shoulder where the IV shunts had been placed. (*Id.* ¶ 42).

4

Police arrived, spoke only to Miranda, and then left the Hospital. (*Id.* ¶¶ 45-46). After they left, Felix pushed and shoved Mr. Johnson back into his room while he pleaded to go home. (*Id.* ¶ 47). The Hospital needlessly reconnected Mr. Johnson to an IV and administered unknown drugs to him. (*Id.* ¶ 57). This caused him to become lethargic and semi-conscious. (*Id.*).

Later that evening, police arrived again and spoke to Plaintiffs. (*Id.* ¶¶ 49-51). Mr. Johnson informed them that the Hospital was holding him against his will. (*Id.* ¶ 52). The police asked if Plaintiffs had insurance, and Mr. Johnson responded that he did. (*Id.* ¶ 51). Upon learning this, the police left. (*Id.* ¶ 53).

The next day, Ms. Austin walked three miles to the police station to file charges against the Hospital, Miranda and Felix. (*Id.* ¶ 54). Plaintiffs later learned that when the police spoke with Miranda on the day of the altercation, she lied and said that Mr. Johnson had surgery and was suffering from an infection, and that it was not safe for him to leave. (*Id.* ¶ 55).

On November 19th, 21st and 22nd, Carnival representatives continued to call Ms. Austin to inquire about their condition. (*Id.* ¶ 59). Each time, Plaintiffs informed Carnival of the situation and that the Hospital was holding them against their will. (*Id.* ¶ 60). Carnival did not contact Plaintiffs again, until their story became national news. (*Id.* ¶ 61).

On November 22nd, Ms. Austin was scheduled to appear on Good Morning America, and the night before, Carnival contacted Mr. Johnson's sister. (*Id.* ¶¶ 65-66). Carnival representatives told her that they wanted to have Ms. Austin paint a positive

picture of Carnival and state that Carnival was not aware of the Hospital's reputation for mistreatment of Americans. (*Id.* ¶¶ 67-68).

This, however, was false because "[i]t is directly contradicted by the US Embassy and Department of State, which publishes a list of hospitals that are safe for American citizens in Mexico. That list does not include [CMA] Hospital, because, the US Embassy explains, there have been previous problems with US citizens at that hospital." (*Id.* ¶¶ 70-72).

Public interest in Plaintiffs' situation grew and on November 23rd, a movie producer contacted Plaintiffs and advised them that he would pay the medical bill. (*Id.* ¶¶ 64, 74). He did so, and the Hospital released Plaintiffs on November 25th, a week after Mr. Johnson had been cleared for discharge. (*Id.* ¶ 76). Representatives from the U.S. Embassy met Plaintiffs, and Plaintiffs flew home the next day. (*Id.* ¶ 77). Mr. Johnson immediately went to a hospital from the airport, where he was admitted for treatment, until December 2, 2019. (*Id.* ¶ 78).

## III.   Standard

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the plaintiff must plead facts that make out a claim that is plausible on its face and raises the right to relief beyond a speculative level. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). The mere

possibility that the defendant acted unlawfully is insufficient to survive a motion to dismiss. *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012) (citation omitted).

The Court's evaluation is a "context-specific task" that requires it to "draw on its judicial experience and common sense." *Jacobs v. Tempur-Pedic Intern., Inc.*, 626 F.3d 1327, 1333 (11th Cir. 2010) (citation omitted). In the process, the Court must draw "all reasonable inferences" in favor of the plaintiff, *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002), and must limit its consideration to the four corners of the complaint and any attached exhibits. *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000) (citation omitted). The facts alleged must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests". *Twombly*, 550 U.S. at 555 (citation omitted). Conclusory allegations are insufficient. *Id.*

## IV.   Analysis

General maritime law governs tort claims that arise on ships sailing in navigable waters. *Yusko v. NCL (Bahamas), Ltd.*, 4 F.4th 1164, 1167 (11th Cir. 2021) (citation omitted). When Congress has not spoken on a maritime matter, courts rely on common law tort principles. *Id.*

### a.   Negligence (Counts III and IV)

Plaintiffs assert two theories of negligence, that they plead in two different counts: first, Carnival is liable for sending Mr. Johnson to the CMA Hospital and failing to warn him of the dangerous conditions therein (Count III), and second, Carnival was negligent when it allowed Plaintiffs to remain at the CMA Hospital without assistance. (Count IV). *See* (ECF No. 38 ¶¶ 106-108, 118-20).

General principles of negligence law apply. *Chaparro*, 693 F.3d at 1336 (citation omitted). "To plead negligence, a plaintiff must allege that (1) the defendant had a duty to protect the plaintiff from a particular injury; (2) the defendant breached that duty; (3) the breach actually and proximately caused the plaintiff's injury; and (4) the plaintiff suffered actual harm." *Id.* (citations omitted).

Cruise lines owe their passengers a duty of "ordinary reasonable care under the circumstances". *Id.* (citation omitted). This includes "a duty to warn of known dangers beyond the point of debarkation in places where passengers are invited or reasonably expected to visit." *Wolf v. Celebrity Cruises, Inc.*, 683 F. App'x 786, 794 (11th Cir. 2017) (quoting *Chaparro*, 693 F.3d at 1336). Whether the cruise line had a duty "hinges on whether it knew or should have known" about the dangers. *Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 720 (11th Cir. 2019) (quoting *Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1322 (11th Cir. 1989)). Thus, as a prerequisite to imposing liability, the cruise line must have had "actual or constructive notice of the risk-creating condition". *Chaparro*, 693 F.3d at 1336 (citation omitted).

Actual notice exists when "the defendant knows of the risk creating condition." *Bujarksi v. NCL (Bahamas) Ltd.*, 209 F. Supp. 3d 1248, 1250 (S.D. Fla. 2016) (citing *Keefe*, 867 F.2d at 1322). Constructive notice exists when "a dangerous condition has existed for such a period of time that the shipowner must have known the condition was present and thus would have been invited to correct it." *Id.* (quoting *Bencomo v. Costa Crociere S.P.A. Co.*, No. 10-62437-CIV, 2011 WL 13175217, at *2 (S.D. Fla. Nov. 14, 2011), *aff'd*, 476 F. App'x 232 (11th Cir. 2012)).

### i.  Plaintiffs' first negligence theory (Count III)

Carnival argues that Plaintiffs' first theory of negligence[1] fails because Plaintiffs do not plead sufficient facts to allege "that Carnival had prior notice of CMA Hospital being a risk-creating condition...." (ECF No. 41 at 10). Carnival asserts that Plaintiffs rely on only one factual allegation for support: that "the U.S. Embassy and Department of State ... publishes a list of hospitals that are safe for American citizens in Mexico" and that "that list does <u>not</u> include [CMA] Hospital ...." (ECF No. 38 ¶¶ 71, 72) (emphasis in original); (ECF No. 41 at 12). Carnival relies on the doctrine of incorporation by reference, to ask the Court to consider this list (the "U.S. Embassy List"), which Carnival attached to its Motion to Dismiss. (ECF No. 41-1). Courts may consider documents attached to a motion to dismiss if they are "referred to in the complaint, central to the plaintiff's claim, and of undisputed authenticity", and the U.S. Embassy List meets these criteria. *Hi-Tech Pharmaceuticals, Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1189 (11th Cir. 2018) (citations omitted). Plaintiffs do not object. (ECF No. 42 at 11). The Court therefore considers the U.S. Embassy List, as if it had been attached to the Amended Complaint.

Carnival argues that the U.S. Embassy List contradicts Plaintiffs' assertion that Carnival had notice that CMA Hospital was a hospital that presented a danger and should be avoided. Carnival relies on this prominent disclaimer at the top of the List:

> The U.S. Consulate Merida assumes no responsibility or liability for the professional ability, reputation of, or the quality of services provided by the following persons or institutions. *Inclusion on this list is in no way an endorsement by the Department of State or U.S. Consulate or Consular Agencies.*

---

[1] This count is filed on behalf of Plaintiff Johnson only.

> The order in which names appear has no significance or preference. You may wish to consult other sources in the selection of doctors and hospitals. The lists below contain information on hospitals and doctors in Merida, Yucatan (and other locations) ....

(ECF No. 41-1 at 1) (emphasis added). Carnival is correct. The List plainly states that "[i]nclusion on this list is in no way an endorsement by the Department of State…." (ECF No. 41-1 at 1). This makes it clear that the Consulate created a list of hospitals that it does *not* endorse. The Consulate does not expressly state, or imply, that hospitals that are *not* on the list must be avoided. The disclaimer directly contradicts Plaintiffs' claim that "the U.S. Embassy and Department of State ... publishes a list of hospitals that are safe for American citizens in Mexico." (ECF No. 38 ¶ 71). "[W]hen the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007) (citing *Associated Builders, Inc. v. Ala. Power Co.*, 505 F.2d 97, 100 (5th Cir. 1974) and *Simmons v. Peavy-Welsh Lumber Co.*, 113 F.2d 812, 813 (5th Cir. 1940)).

A central failing of the CMA Hospital, as alleged in the Amended Complaint, is that the Hospital held Plaintiffs captive for payment. In Count III, Plaintiffs allege that "Carnival had actual knowledge of the 'no-go' status of [the CMA Hospital] or should have known that it was off limits for American citizens because it had been known to engage in the same type of false imprisonment and extortion that occurred here." (ECF No. 38 ¶ 103). The List further undermines this allegation, as it warns that hospitals *included* on the List engage in this behavior:

> **Please be aware that the U.S. Consulate and the Consular Agencies will NOT pay your medical bills nor mediate a billing dispute between you and the hospital or physician**. <u>All doctors, hospitals or medical facilities, public or private, will require full payment for services to be rendered, in cash or by credit card, at the time of service.</u> Most are NOT able to bill your US insurance company for payment. Rather, they will give you receipts for your payment so you may request reimbursement form your U.S. insurance carrier; be sure to get an itemized bill. <u>We have had many cases of U.S. citizens not allowed to discharge from local hospitals until payment is made in full.</u> If you believe you are being charged unfairly, you may contact the Mexican government consumer rights protection agency ....

(ECF No. 41-1 at 1) (bold in original, underline added).

This language also contradicts the allegation in paragraph 72 of the Amended Complaint that the "list does <u>not</u> include [the CMA Hospital], because, the US Embassy explains, there have been previous problems with US citizens at that hospital." (ECF No. 38 ¶ 72). The List, however, makes no reference to the CMA Hospital, at all, and it plainly does not "explain" that there have been problems at that facility. Perhaps the allegation at paragraph 72 is meant to suggest that the US Embassy has "explained" this in some other communication. If so, the allegation is wholly inadequate, as the Amended Complaint lacks any factual allegations to support this conclusory statement.

In sum, the plain language of the U.S. Embassy List does not support Plaintiffs' allegation that Carnival had actual or constructive notice of the alleged dangers of the CMA Hospital.

Plaintiffs argue that these other paragraphs in the Amended Complaint adequately plead notice:

> 70. The statement by Carnival, that it had no knowledge of the reputation of Centro Medico Americano Hospital, or that it had a history of mistreating Americans, was false.
>
> 88/101. ... Carnival knew that Centro Medical Americano Hospital was not an approved medical facility for US passengers, that the Hospital was dangerous, unsanitary, and that it had engaged in similar behavior in the past.
>
> 114. Carnival had actual knowledge of the "no-go" status of Centro Medico Americano Hospital or should have known that it was off limits for American citizens because it had been known to engage in the same type of false imprisonment and extortion that occurred there.
>
> 128. ... Carnival, through its agents, servants and employees, negligently or intentionally breached its duties to Mr. Johnson and Ms. Austin in allowing Mr. Johnson to be transported to an unapproved hospital ...

(ECF No. 42 at 10) (quoting ECF No. 38 ¶¶ 70, 88, 101, 114, 128). I do not agree. These are conclusions, that do not have the support of factual allegations that make it plausible that Carnival was on notice. *See, e.g.*, *Nichols v. Carnival Corp.*, No. 19-cv-20836, 2019 WL 11556754, at *7 (S.D. Fla. June 21, 2019) ("Plaintiff argues that Carnival had or should have had knowledge based on prior incidents ... which were or should have been reported. ... But Plaintiff does not allege what prior incidents may have occurred, and on what excursions, nor *how* these incidents put Carnival on notice.").

Plaintiffs also argue that an allegation in the initial Complaint, that there is additional correspondence from the U.S. Embassy that placed Carnival on notice, supports the sufficiency of its Amended Complaint. That allegation is: "The U.S. Embassy has stated: '. . . [CMA] *Hospital is not on the list*, (of approved hospitals for Americans in Mexico) *due to previous problems experienced by other U.S. Citizens.* '" (ECF No. 1 ¶ 95).

Allegations in the dismissed first Complaint are irrelevant, because "an amended complaint supersedes the former pleadings." *TVPX ARS, Inc. v. Genworth Life & Annuity Ins. Co.*, 959 F.3d 1318, 1327 (11th Cir. 2020) (alteration adopted) (internal quotation marks omitted).[2]

Plaintiffs make this broad statement and cite three decisions as authority:

> this Court and the Eleventh Circuit have held, time and again, that factual allegations that CARNIVAL had knowledge of a specific dangerous condition is [*sic*] sufficient to support a claim that it knew or should have known about the dangers posed, and thus [*sic*] sufficient to withstand a motion to dismiss.

(ECF No. 42 at 9). Those three decisions, however, unlike the Amended Complaint, have specific factual allegations that make it plausible that Carnival, in those cases, was on notice, and therefore, they do not support Plaintiffs' argument here.

First, the plaintiffs' decedent (here, the "passenger") in *Chaparro v. Carnival Corp.*, was a cruise passenger who disembarked the ship in St. Thomas and visited Coki Beach independently of the ship's sponsored excursions. 693 F.3d at 1335. The passenger traveled back to the ship in an open-air bus, past a funeral service for a gang member who recently died in a gang-related shooting near the Beach. *Id.* Gang-related, retaliatory violence erupted at the funeral, and shots were fired that killed the passenger. *Id.* Carnival moved to dismiss the complaint, arguing that passenger's shooting death was unforeseeable and thus

---

[2] Even if this allegation were in the Amended Complaint, it would not solve the problem, as it includes no facts about when, where, how or to whom this alleged statement was made. The Court does not suggest that all those details would have to be plead, rather it notes that there are *none.* The allegation is a conclusion, that a statement was made, without any factual support to make it plausible.

Carnival had no duty to warn her of the danger. *Id.* at 1336. The trial court granted Carnival's motion and the Court of Appeals reversed. The appellate court noted that the complaint included allegations that: Carnival was familiar with Coki Beach because it sold excursions to passengers to that Beach, Carnival monitors crime in its ports of call and therefore it generally knew of gang violence and public shooting in St. Thomas, it knew of Coki Beach's reputation for drug sales, theft and gang violence and it knew or should have known of the gang member's shooting and funeral. *Id.* at 1337. The Court of Appeals found that the "facts alleged in the complaint are plausible and raise a reasonable expectation that discovery could supply additional proof of Carnival's liability." *Id.* (citing *Twombly,* 550 U.S. at 556).

Next, the plaintiffs' decedent (again, the "passenger") in *Twyman v. Carnival Corp.*, died during a jet ski excursion at the Grand Turk Cruise Center, which Carnival allegedly owned, operated, managed, or controlled. 410 F. Supp. 3d 1311, 1315 (S.D. Fla. 2019). The plaintiffs alleged that Carnival had crewmembers and personnel at the Cruise Center and that it inspected the operations there, and therefore it knew or should have known of the dangers presented by the jet ski operation. *Id.* at 1320. The trial court concluded that these were sufficient factual allegations of notice, that survived Carnival's motion to dismiss.

The third case is *Kennedy v. Carnival Corp.*, 385 F. Supp. 3d 1302 (S.D. Fla. 2019). The passenger there was injured while participating in a shore excursion. *Id.* at 1311. The plaintiff alleged that Carnival directly profited from the shore excursion, that it made representations that it regularly oversees, monitors, and inspects the operations of its tour

operators, and that from this, Carnival knew or should have known of the danger. *Id.* at 1331. The Court found that "Plaintiff's allegation that Defendant should have been aware of the risk-creating condition during inspections of the excursion is sufficient to provide actual or constructive notice of the risk-creating condition." *Id.*

These three cases include factual allegations that made it plausible that Carnival knew, or should have known, of the danger. In *Chaparro*, Carnival regularly sent passengers to Coki Beach, it monitored crime in the areas where its passengers disembarked and where it sent them on excursions, and therefore it likely knew of the presence of gangs and gang violence in the location, and knew, or should have known, of the gang member's funeral and the risk of violence. In both *Twyman* and *Kennedy*, the passenger was injured while participating in an excursion that Carnival oversaw, monitored, and inspected. This makes it entirely plausible that Carnival knew, or should have known, of dangerous conditions.

Plaintiffs' conclusory argument – with no analysis of the cases – that these three decisions should lead this Court to find that Plaintiffs have adequately plead notice, finds no support in the facts of those cases. By comparison, here, Plaintiffs do not allege that Carnival ever sent a passenger to the CMA Hospital or otherwise had any prior experience with that Hospital, or that it monitored the bona fides of all hospitals near its ports of call. Plaintiffs' only factual allegation concerns the U.S. Embassy List, which contradicts Plaintiffs' claims of notice. Without factual allegations that make it plausible that "discovery could supply additional proof of Carnival's liability", *Chaparro,* 693 F.3d at 1336, the Amended Complaint falls short of the standard set forth in Rule 12(b)(6).

For these reasons, the Court **GRANTS** Carnival's motion to dismiss Count III, and does so **without prejudice**. It is a close question whether Plaintiffs should be permitted another opportunity to plead this negligence claim. The Court will give Plaintiffs one final opportunity to do so. *See Welch v. Laney*, 57 F.3d 1004, 1009 (11th Cir. 1995) ("Where a more carefully drafted complaint might state a claim upon which relief could be granted, the district court should allow the plaintiff to amend the complaint rather than dismiss it.").

### ii. Plaintiffs' second negligence theory (Count IV)

The second negligence count, which is filed on behalf of both Plaintiffs, begins with assertions of multiple duties that Carnival owed them. Other than the first duty alleged in paragraph 113 (which is the focus of the first negligence count), Carnival does not contest these allegations. Count IV alleges that Carnival had the duty:

> 111. ... to use reasonable care to ensure the safety of its passengers throughout the duration of the trip.
>
> 112. ... to provide prompt and appropriate medical care, to make reasonable efforts to ensure the passengers' safety and to warn them of dangers about which Carnival had actual or constructive knowledge.
>
> 113. ... to be aware of and protect its passengers from dangers such as those posed by Centro Medico Americano Hospital, to assist passengers in clearing Customs, to make security arrangements when necessary, and to assist guests left behind in arranging transport to the next port of call or other destination.

(ECF No. 38 ¶¶ 111-13).

16

Notably, the Amended Complaint does not expressly allege that Carnival had a duty to secure Plaintiffs' release from the Hospital. Yet, this is indirectly suggested by these allegations of Count IV, that Carnival breached its duties:

> 118. ... by allowing [Plaintiffs] to remain at Centro Medico Americano Hospital without assistance.
>
> 119. ... by failure to ensure [Plaintiffs'] safe passage throughout the duration of the trip, and by refusing to arrange for their transportation home.

(*Id.* ¶¶ 118-19). Paragraph 118 suggests Carnival had the duty to assist Plaintiffs while at the Hospital, but it does not state what that assistance was. Was Carnival obligated to pay or negotiate the medical bill, or facilitate Plaintiffs' escape, despite non-payment? We are left to guess. Other allegations of the Amended Complaint suggest that Carnival, at least in part, met the obligation set out in paragraph 119, "to arrange for [Plaintiffs'] transportation home." *See* (*id.* ¶¶ 29-30) (Plaintiffs were "scheduled to board another Carnival ship to return to the United States" and "Mr. Powell and another agent … came to the hospital to accompany them back to the new ship").

In its Motion to dismiss Count IV, Carnival argues that it had no duty to "facilitate [Plaintiffs'] escape from the hospital" and therefore the Court must dismiss that count. (ECF No. 41 at 15). Notably, in its response memorandum, Plaintiffs do not dispute that Count IV alleges that Carnival had this duty to facilitate their escape. Instead, Plaintiffs lump together their argument in defense of both Counts III and IV (both negligence counts) and do not address Carnival's argument for dismissal of Count IV. Importantly, Plaintiffs

provide no legal authority that Carnival had a duty to secure Mr. Johnson's release from the Hospital. (ECF No. 42).

So, the first problem with Count IV is its failure to clearly put Carnival on notice of the nature of the duty that it had to "assist" Plaintiffs when the Hospital refused to allow Mr. Johnson's discharge because of lack of payment. The existence of a duty is a question of law, *Wolf*, 683 F. App'x at 794 (citing *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1339 (11th Cir. 2012)), and the second problem is that Plaintiffs provide no law that places such a duty on Carnival.

For its part, Carnival cites several cases that support its position that once passengers leave the ship, the cruise line's duty is limited to a duty to *warn* of known dangers. *See* (ECF No. 41 at 16-17) (citing *Lipkin v. Norwegian Cruise Line, Ltd.*, 93 F. Supp. 3d 1311, 1324 (S.D. Fla. 2015); *Kadylak v. Royal Caribbean Cruise, Ltd.*, 167 F. Supp. 3d 1301, 1309 (S.D. Fla. 2016); *Mills v. NCL (Bahamas) Ltd.*, No. 13-24174-CIV, 2015 WL 11201209, at *6 (S.D. Fla. Apr. 10, 2015); *Carlisle v. Ulysses Line Ltd., S.A.*, 475 So. 2d 248, 251 (Fla. 3d DCA 1985)). Of course, a duty, by Carnival, to secure Plaintiffs' release from a hospital, would exceed this limitation.

The Court notes that there is some authority for the notion that a cruise line might have a duty that exceeds the standard duty to warn of known dangers, where, for example, there is an agency relationship between it and the third party that caused the harm – at least where that third party is an excursion operator. *See Pucci v. Carnival Corp.*, 146 F. Supp. 3d 1281, 1287 n.4 (S.D. Fla. 2015) ("While generally the duty to warn is the most relevant duty regarding off-vessel excursions, a cruise ship might have additional

18

obligations under the 'reasonable care' standard, if, for example, there is an agency relationship between the cruise ship and the excursion operator."). This is inapplicable here, as Plaintiffs do not allege that an agency or partnership relationship existed between Carnival and the CMA Hospital.

In sum, Plaintiffs have failed to support their negligence claim in Count IV with legal authority that Carnival had a duty to facilitate their departure from the Hospital, when Plaintiffs had not made payment. Even if Plaintiffs clearly replead the claim alleging such a duty, it would fail as a matter of law. The Court **GRANTS** Carnival's motion to dismiss Count IV **with prejudice**. *See L.S. ex rel. Hernandez v. Peterson*, 982 F.3d 1323, 1332 (11th Cir. 2020) (Courts may deny leave to amend "if amendment would be futile.").

### b. IIED (Counts I and III)

Plaintiffs allege two counts for IIED (Counts I and II), which mirror their negligence claims. That is, the first theory of IIED rests on Carnival's decision to send Plaintiffs to the CMA Hospital, while the second is based on Carnival's failure to assist Plaintiffs while they were at the Hospital. *See* (ECF No. 38 ¶¶ 86-98).

The parties agree that the elements to state a claim for IIED are the following: "(1) extreme and outrageous conduct; (2) an intent to cause, or reckless disregard to the probability of causing, emotional distress; (3) severe emotional distress suffered by the plaintiff; and (4) that the conduct complained of caused the plaintiff's severe emotional distress." *Broberg v. Carnival Corp.*, 303 F. Supp. 3d 1313, 1317 (S.D. Fla. 2017) (citing *Blair v. NCL (Bahamas) Ltd.*, 212 F. Supp. 3d 1264, 1269 (S.D. Fla. 2016)).

The extreme and outrageous conduct in the first element must be "so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quoting *Metropolitan Life Ins. Co. v. McCarson*, 467 So.2d 277, 278 (Fla. 1985)). "While there is no exhaustive list or concrete list of what constitutes outrageous conduct, Florida common law has evolved an extremely high standard." *Id.* (citation omitted). This is an objective determination that is a question of law, not of fact. *Blair*, 212 F. Supp. 3d at 1270 (citation omitted).

Carnival argues that Plaintiffs fail to allege sufficient facts to support the first, second and fourth elements. (ECF No. 41 at 6-7).

### i.   The first theory of IIED (Count I)

Plaintiffs bring this claim on behalf of Mr. Johnson. They allege that "Carnival knew that [CMA] Hospital was not an approved medical facility for US passengers, that the Hospital was dangerous, unsanitary, and that it had engaged in similar behavior in the past." (ECF No. 38 ¶ 88). For this, they rely on the same allegations regarding the U.S. Embassy List, that are central to their first negligence claim. (*See id.* ¶¶ 71-72). They further allege that "Carnival's actions in directing or allowing Mr. Johnson to be taken to the [CMA] Hospital went beyond the bounds of decency and were shocking, atrocious and utterly intolerable in a civilized community" and "caused severe emotional and physical distress to the Plaintiffs." (*Id.* ¶¶ 90, 91).

For the reasons stated *supra*, Plaintiffs have failed to plead that Carnival had actual or constructive notice that the CMA Hospital was dangerous. Without this, Plaintiffs'

allegation that Carnival's decision to send Mr. Johnson to the Hospital was extreme and outrageous conduct, or that it intended to cause, or recklessly disregard the probability of causing, Mr. Johnson emotional distress, fails.

The Court therefore **GRANTS** Carnival's motion to dismiss Count I, but because the factual allegations mirror those under Count III, the Court dismisses Count I **without prejudice**.

### ii.   Plaintiffs' second theory of IIED (Count II)

Plaintiffs' second theory of IIED alleges: "Carnival's conduct in allowing the Plaintiffs to be held against their will, ignoring the Plaintiffs' plight, and refusing to take action by involving the US Embassy, law enforcement, or others, also went beyond the bounds of decency and was shocking, atrocious, and utterly intolerable in a civilized community." (ECF No. 38 ¶ 97).

As already noted, the Court knows of no legal authority that imposed on Carnival a duty to secure Plaintiffs' release from the CMA Hospital after Plaintiffs were unable to pay the medical bill. With no such duty, Carnival's conduct cannot meet the "extremely high standard" that it engaged in extreme and outrageous conduct, or that it acted with "an intent to cause, or reckless disregard to the probability of causing, emotional distress". *Broberg*, 303 F. Supp. 3d at 1317-18.

For the foregoing reasons and for those stated in the Court's analysis of Plaintiffs' second theory of negligence, *supra*, the Court **GRANTS** Carnival's motion to dismiss Count II **with prejudice**.

### c.  NIED (Count VI)

Ms. Austin asserts one count of NIED against Carnival (Count VI). She alleges, in sum, that "[i]n addition to her own injuries which resulted from being attacked while trying to leave the hospital ... watching Mr. Johnson suffer as a result of Carnival's actions in transporting him to [the CMA Hospital] caused [her] additional psychological harm ..., [which] has manifested itself as physical injuries ...." (ECF No. 38 ¶¶ 131-32).

To state a claim for NIED under federal maritime law, a plaintiff must allege "mental or emotional harm (such as fright or anxiety) that is caused by the negligence of another and that is not directly brought about by a physical injury, but that may manifest itself in physical symptoms." *Chaparro*, 693 F.3d at 1337-38 (quoting *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 544 (1994)). Federal maritime law has adopted the "zone of danger" test, which limits recovery to those plaintiffs who are "placed in immediate risk of physical harm by [defendant's negligent] conduct." *Id.* at 1338 (quoting *Stacy v. Rederiet Otto Danielsen, A.S.*, 609 F.3d 1033, 1035 (9th Cir. 2010)). Importantly, the claim "requires an adequately pled underlying claim of negligence." *Id.* at 1337.

Given Plaintiffs' failure to plead a claim for negligence, this claim also fails. The Court thus **GRANTS** Carnival's motion to dismiss Count VI. As with Count III, the Court dismisses Count VI **without prejudice**.

### d.  False imprisonment (Count V)

Plaintiffs allege one count of false imprisonment that is based on Plaintiffs' forced detention at the Hospital. They allege: "Although Carnival did not actively participate in

the restraint, it was the actions of Carnival's agents, servants and employees that directly or indirectly procured the occasion for the hospital to do so." (ECF No. 38 ¶ 122).

Here, the common law principles expressed in the Restatement (Second) of Torts apply. *See Barnes v. Carnival Corp.*, No. 06-20784-CIV, 2007 WL 9702151, at *2 (S.D. Fla. Apr. 12, 2007). The elements of false imprisonment are: "(a) an act intending to confine another within boundaries fixed by the actor; (b) the act directly or indirectly results in such a confinement; and (c) the confined person is conscious of the confinement or is harmed by it." *Id.*

Carnival argues that Plaintiffs fail to plead the first element, as they do not allege that Carnival committed an act intending to confine Plaintiffs within boundaries fixed by Carnival. (ECF No. 41 at 7).

Plaintiffs do not address this argument in their response. Rather, they focus on the second element and argue that Carnival's actions "directly or indirectly procured" the Plaintiffs' restraint by CMA Hospital. (ECF No. 42 at 6-7).

Carnival's "act," that is the focus of the Amended Complaint, was it taking Plaintiffs to a hospital that it knew or should have known was dangerous. But, as noted, Plaintiffs allege no facts that plausibly indicate that Carnival had, or should have had, this knowledge.

Plaintiffs concede that Carnival did not actively participate in the Hospital's restraint of Plaintiffs, and importantly, Plaintiffs do not allege that Carnival is vicariously liable for the actions of CMA Hospital. It is also true that Plaintiffs alleged no facts that plausibly show that, by sending them to the Hospital, Carnival intended to confine them.

Moreover, there are no factual allegations to indicate that Plaintiffs' confinement was within boundaries set by Carnival. In sum, Plaintiffs' factual allegations are plainly insufficient to support a claim for false imprisonment.

The Court **GRANTS** Carnival's motion to dismiss Count V. The Court dismisses that Count **with prejudice**, as the Court has already provided Plaintiffs an opportunity to replead this claim, and the underlying facts have not changed. Those facts cannot support a claim for false imprisonment and therefore amendment would be futile. *See Peterson*, 982 F.3d at 1332.

### e.  Punitive damages

Carnival alternatively asks the Court to strike each claim's prayer for punitive damages. (ECF No. 41 at 17-19). Given the dismissal of all claims, there is no reason for the Court to also strike the punitive damages claims.

The Court notes, however, that punitive damages could only be awarded for intentional misconduct on Carnival's part. *Hall v. Carnival Corp.*, --- F. Supp. 3d ----, No. 21-cv-20557, 2021 WL 1699878, at *4-5 (S.D. Fla. Apr. 29, 2021). To demonstrate intentional misconduct, a plaintiff must show that "the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and despite that knowledge, intentionally pursued that course of conduct." *Id.* at *5 (citation omitted).

Plaintiffs have not plead this, and therefore the Amended Complaint does not support a claim for punitive damages.

## V.    Conclusion

For the foregoing reasons, the Court **GRANTS** Defendant's Motion to Dismiss the Amended Complaint, (ECF No. 41). The Court **DISMISSES WITH PREJUDICE** Counts II, IV and V and **DISMISSES WITHOUT PREJUDICE** Counts I, III and VI.

The Court further provides Plaintiffs leave to amend the Complaint, which Plaintiffs shall file **no later than December 10, 2021**.

DONE and ORDERED in Miami, Florida this 19th day of November 2021.


CHRIS McALILEY
UNITED STATES MAGISTRATE JUDGE